Good morning. May it please the Court, my name is Michael Pichetta. I'm with the Federal Public Defender's Office. I represent Mr. Ibarra in this matter. I'd like to reserve five minutes for rebuttal, if I may. Sure. In many ways, this is the archetypal hard case in death penalty jurisprudence. This is a case involving a terribly gruesome offense. But it's committed by someone who is mentally ill. And so we have what, in the United States Supreme Court's jurisprudence since Greg v. Georgia, a case where a jury could certainly go either way. I'm certainly not going to be able to talk about everything in this case today. There is far too much of it already. But let me focus on what I hope are the less controversial issues first, and then talk about the procedural default questions. Mr. Ibarra's jury was given the depravity instruction that was found unconstitutionally vague in Deutscher, first by this Court, then again in subsequent decisions, in the en banc decision in Valeria v. Crawford. There is no question, it would seem to me, that it is unconstitutionally vague. And this Court and the District Court, Judge Reed, found that it was unconstitutionally vague. They found that the error in that was harmless. I submit that that really cannot be the conclusion here. This is the archetypal instruction that turns the jury loose to indulge its own proclivities, its own standardless discretion in determining that this case has to be a death case. Do I understand correctly that the District Judge basically agreed with you as far as the depravity part of this concern, but then said there's also torture and mutilation. There's no doubt that the jury would have did by mutilation and torture. Yes, Your Honor. How could it be otherwise? That's what Judge Reed concluded. Why is that wrong? Because, first, we don't know. We're reviewing what the jury did do. And we don't know whether the jury in fact focused on depravity. When the prosecutor argued, you'll know it when you see it, that is, I believe, an appeal to the jury to find that whatever this is, it's depravity. As the case was tried, was there any dispute that the victim was tortured and mutilated? Yes. There was no concession as to torture. There was as to mutilation, though. As to mutilation was made only after the defense lawyer asked for an arrowing instruction and didn't get it. This occurred prior to the Nevada Supreme Court's decision in Robbins v. State, in which it held that in order for the State to show torture or mutilation, it has to be beyond the act of killing itself. So essentially what Judge Reed did, and I think under Valerio this is entirely impermissible, was essentially to apply an arrowing instruction himself. She was burned alive, right? Yes. How could that not be torture? What theory is that that would not be torture? Because the act of killing, the act of burning her, was what killed her. And there is the question of intent. Because although there is evidence that there are inferences that could be drawn both ways, we don't know whether Mr. Ibarra actually had any intent other than to kill her. If that statement is correct, then no one could ever be guilty of torture for engaging in behavior that caused the death. In other words, suppose it was the death of a thousand cuts, and it was the thousandth cut that actually caused mortality. Under your theory, that couldn't be torture, even if it was committed over a two-day period. I disagree, Your Honor. Respectfully, I think that at the end of the day, the question is, is the act of killing, and in Your Honor's example, that would be the last stab, does the killing involve something else that is torturous? Your answer to my question is yes, under your theory, that couldn't be torture. No, I disagree, Your Honor. Respectfully, I'm probably not making myself clear. I don't understand your answer. It seems to me, if Your Honor is saying, all right, with the intent to inflict extreme and prolonged pain, the defendant stabs the victim 50 times, well, try 45, apparently that's not enough. We've had as many as 80 in Nevada, and the juries have not found it. That's the torture aspect, but the killing, so long as the killing is the last stab, Suppose the killing takes all of it, it's an accumulation. I mean, the classic death by a thousand cuts presumes that it took all 1,000, that the last one by itself wouldn't have done it. If that's the factual scenario, is it the case that your theory would call that something other than torture? I agree with the premise, Your Honor, but I think under that scenario, yes, unfortunately. But why should that be the case? Why isn't the Nevada formulation meant to take out the killing part, but not leave open the possibility of torture being found by the unusually prolonged manner in which it was inflicted? I mean, if you have the choice between zapping somebody and that's it, or using the thousand cuts, why is the thousand cuts immune? This is not a thousand cuts. This is... Burning somebody alive is pretty darn close to that. I mean, is that really the only way that he could have disposed of her? Well, that brings up the question that isn't this... If this is torture, if this is mutilation, what we're doing is we're rewarding the assassin. We're saying that someone who brings a .22 with a hollow point bullet and kills somebody with one shot premeditatedly is less culpable than someone who is out in the desert... Well, they're surely not culpable for torture, whatever depravity of mind stands for, or mutilation, are they? So that aggravating factor wouldn't be on the table for them. Probably lots of others that would be. But look at that. Isn't that the case? You're right. A cold-blooded assassin who kills that way would not be susceptible to being found liable for the aggravating factor in question. Yes. Yes, Your Honor. Why shouldn't your client be found liable? Because he wasn't so efficient. That's exactly the problem, Your Honor. Do we want to reward efficient killing, or in a circumstance where you have mentally a man who has a can of gas? Well, apparently the answer is yes, because the legislature established as an aggravated factor torture or mutilation. Now, there are other things that a professional assassin is going to run afoul of, but I don't understand why it is that your client couldn't be found guilty on this aggravating factor if, in fact, what he did was do something that imposed the kind of agony that I just can't imagine this woman suffered. It is. That is the basic problem with this case, is that it's very difficult to imagine. A more torturous form of murder. Again, we're talking about both intent as well as act. Well, he burned her alive, and he left her while she was still alive in the desert. We know from the forensic evidence that she survived for more than 24 hours with 80% burns over her body. So when he left her, if he had been trying to kill her, he didn't succeed yet. But the combination of the nature and extent of the injuries that he inflicted on her, coupled with the exposure, coupled with the fact that, as I understand medical testimony, it's pretty difficult to survive when that much of the body is burned, that combination of factors is what I think supplies sufficient evidence to support a jury's verdict of both torture and mutilation. And trial counsel conceded to the jury that she had been mutilated when her face was burned beyond recognition. Again, Your Honor, that concession... So why was Judge Reed in error in concluding that it wouldn't have made any difference without regard to what the jury knew about his depravity of mind? Again, Your Honor, respectfully, that concession as to mutilation was made only after the state trial judge refused to instruct on mutilation. Now, again, and we're talking about the construct that the Nevada Supreme Court adopted in Robbins. Well, you're also overlooking, though, the other aggravating factors, Mr. Bichetta, and that is that the murder was committed in the course of a kidnapping. It was committed in the course of a rape. He had previously been convicted of a violent felony, all of which are statutory aggravators under the Nevada statute to justify a death sentence. But there is, under Nevada law, absolutely no circumstance in which a jury is required to impose death, no matter how overwhelming the aggravating factors are. But we have to apply the Brecht v. Abramson standard, and on a horrible set of facts like this, I am having a very difficult time concluding that if there was a constitutional violation, that it was substantially injurious to question the death verdict. That's what we have to decide, is it not? Yes, Your Honor. But, again, let me take you back to the en banc decision in Valerio, in which the court said a state court, even a state court, which can apply a narrowing construction and re-weigh, can't do that if the original sentence was imposed by a jury, and the original aggravating and mitigating factors were found by a jury. Even less so, Your Honor, I submit, can a federal judge do that, apply a narrowing construction and essentially re-find what the jury should have. So your position is that we can never get to the Brecht analysis? Here, I submit, not. I wonder if we could shift gears and talk about another issue that concerns me. Yes. You raised as error the district judge's dismissal of ground three, the question of jury impartiality. As I recall, Judge Reed dismissed that as unexhausted. Yes, Your Honor. And it's your contention that it was exhausted? Yes, Your Honor. Can you tell us a little about that? It was exhausted on the pretrial appeal under Nevada law at the time of the trial here. In order to preserve your claim of improper venue, you had to appeal pretrial. That's since been abolished. And if you look even back in 1993 when this case was dismissed, I think for the second time, and that's at 3569 of the excerpts of record, Judge Reed at that time recognized that point three had been submitted to the Nevada Supreme Court on that pretrial, on the pretrial appeal. And so at this point, clearly, it's exhausted. Now, the state contends that it is not actually exhausted, even in the order granting and denying the certificate of appealability in part. Judge Reed recognized that, in fact, it did appear to be exhausted. I don't think there's any question that at this point, and this is the point where under Buchanan v. Sharp and Buffalo v. Sun, if it is recognized that the claim is exhausted, it's exhausted. And so putting aside the question whether any of these other claims that have been reviewed on the merits were or were not harmless error under Brecht, this is why I submit this case has to go back for Judge Reed to address that issue and to address the other issues that were dismissed on procedural grounds. Let me ask you, suppose we agree with you that you're right, this was exhausted. Is this a pure legal question that we could deal with, agree with, rule in your favor on the merits, rule against you on the merits, or do we have to send it back to Judge Reed? I believe that this has to go back to Judge Reed because the venue claim is certainly very fact-specific in this case, and Judge Reed, as I think the presumption always is in the district court, should take the first crack at it. There is the additional question. But he can't, under Pinholster, he can't convene an evidentiary hearing, can he, given the fact that the Nevada Supreme Court has already ruled on the, wouldn't it be just a strict AEDPA evaluation? I think so, Your Honor. So why can't we do that? The record isn't going to be any different. I don't think the court should do that. I think Judge Reed should do that in the first instance, particularly because there are other claims that Judge Reed should resolve. Without regard to the other claims, let's just focus on this one. I'm trying to understand. This case has been pending in the courts of Nevada and before federal district courts for 33 years, and I'm wondering why should we send this case back for yet another round of litigation when we know that the record will be exactly the same, other than we'll have the benefit of Judge Reed's analysis of the legal issue, which we're going to review de novo? I wouldn't discount that, but I would have to agree with Your Honor. I mean, this case seems to me to be sort of the poster child for why Congress adopted AEDPA, in order to put an end to this round-robin of appeal after appeal after appeal. At some point, the state has an interest in carrying out its sentence. I agree with those, Your Honor, only if it has been as thoroughly reviewed for federal constitutional error as it should be, and that's why I think I should turn to the procedural default issues here. I'll just mention the Rule 41 problem. In my mind, there is no question that Judge Reed did not satisfy the mandate of Dahl v. City of Huntington Beach and other cases in the circuit, in which this court and other courts have said that a Rule 41 dismissal of claims, of either the entire complaint or substantive claims, is a very drastic sanction, and it is highly relevant to consider in making the determination whether that drastic sanction should be imposed the degree of personal responsibility on the part of the party, as opposed to the responsibility of the lawyers. Here, it seems quite clear from the record that the fault for the failure to completely exhaust all of the available claims ultimately resides on counsel, and if you look at the fact pattern, which is noted at page 59 of 25 of our opening brief, this is a case where, initially, this is not a voluntary dismissal. The two lawyers who were appointed in federal court asked for funds, asked for assistance in fully investigating and presenting all of the available claims in front of Judge Reed. Judge Reed, instead of granting that and proceeding with the federal proceeding, sua sponte, dismissed the petition without prejudice for exhaustion, and issued what has since become called a conditional order under Rule 41. So first, there is a question, I submit, whether under Rule 41b this is a voluntary dismissal, but he directed the lawyers to go back into state court, file a state petition, which they did. At that point, they sought appointment from the state court, both lawyers. The state district court didn't want to, and in fact, counsel for the state opposed it and said, no, you shouldn't appoint these people. And when the San Francisco lawyer, who was at that point appointed by the federal district court, basically left the picture, the remaining lawyer, the Nevada lawyer, Ms. Cartlidge, asked for co-counsel because she couldn't do this whole case herself. And at that point, again, counsel for the state told the district court, the state district court, don't appoint her, appoint somebody who will do it all at once. So now she's not appointed, and a new lawyer, who has had no contact with the case, who's never been in federal court, gets appointed and proceeds to exhaust what's before him, but not to do any additional investigation outside the record. So then when it comes back, and we are now stuck with the case because that attorney has also left the picture, now we have to address, we allege further issues. And at that point, Judge Reed ordered us to abandon them under Rule 41. And what was the period of time between the warning that the district court gave to Mr. Ibarra and the appearance by your office in which the warning was carried out? 1993 to 2002, Your Honor. So we're talking about a nine-year period, and you are not contesting, are you, that the language of the district court's order of March 31, 1993 was unclear? At this point, Your Honor, I think I have to concede that it made clear that the party and the lawyers should come back only with exhaustive claims. All right, that's how I read it. Yes. It's pretty direct? The same trend of saying, okay, if you have new, if you find new claims, I will absolutely dismiss them or order you to abandon them. That may be implicit. It's certainly not explicit. So take a situation where, for instance. Well, basically the order says in March of 1993, the district court had identified, I guess counsel had identified approximately 50 unexhausted claims. And I guess your position is that as a result of multiple changes in counsel and not giving the defense everything that it wanted in that nine-year period, that wasn't sufficient time to exhaust the 50 claims? But more important, it's not so much the time. It's that no one has made any allegation that it is Mr. Ibarra who is responsible for not complying. I mean, AEDPA is replete with notions of diligence, and I'm having a very difficult time understanding why we should excuse and find cause for the default in not complying with the district court's order in nine years of litigation. The distinction, Your Honor, is this is not cause. This is a Rule 41B dismissal as a sanction. But your explanation is that it should have been excused because of ineffective assistance of counsel. Isn't that what you're arguing? It's not a question whether it's ineffective assistance of counsel, Your Honor. There's no question in your average civil case where this happens, as in Dahl v. City of Huntington Beach. There's no right to effective assistance of counsel at all. It's the question before the court under Rule 41B is, and what the court has to consider is, is this violation the party's fault or is it the lawyer's fault? Well, any time there's a new lawyer, there's likely to be a new theory or a new articulation of theory, but we don't keep hearing the new theory or new articulation of hearing. Now, Mr. Ibarra may be in an unusually weak position to control what his counsel does, but at some point, clients act through counsel. And why is it? We can't call it ineffective assistance because we're in collateral relief, but what's so far off the mark of what the lawyers did? This is Rule 41B of the rules of civil procedure, and this court's jurisprudence about that provision makes the clear distinction between counsel's fault and the party's fault.  Rule 41B talks about failure to prosecute, and we routinely dismiss for failure to prosecute claims that have been pending for far less than nine years. So how did the district court abuse its discretion in enforcing the rule? When it clearly warned Mr. Ibarra and whoever was representing him at the time, get this done and don't come back to me until you've exhausted them all. I think it is critical, again, that it's the distinction between counsel and the party, and particularly here, where unlike your average civil litigant, a civil litigant who has the resources to direct counsel or to change counsel to do what the party wants, this litigant does not have that power. Let me address the Moran issue because I think that is also one of the most important ones here, and I'm afraid I'm going to run out of time rather quickly. The district court said you're barred by Moran because NRS 34.800 is categorically an adequate and independent state grant for the judgment. So the third habeas petition ruling by the Nevada Supreme Court, which invoked 34.810, which is not adequate under Valerio and previous cases, could not be adequate and independent, but 34.800 could. Between the time of Moran, putting aside the question of whether Moran really decided this issue or whether it was Dickman, because the tininess rules that it discussed in the Moran decision had nothing to do with 34.800, what we have between then and now are Bennett v. Mueller, which puts the burden of proof of showing adequacy and independence squarely on the state, and Powell v. Lambert, which requires the court in its review of the consistency and adequacy of procedural default rules to review unpublished decisions as well as published decisions. In the Moran case, there's no discussion of or even reference. Well, the subsequent three-judge panel decisions can't overturn Moran. If it's Dickman, you can. If it's Dickman, it doesn't need to be overturned. If there's a change in law, as there is in Bennett and Powell v. Mueller. No, I disagree as a proposition that a three-judge panel can, by articulating a broader standard, overturn a prior three-judge panel decision. That just doesn't work. And I'm trying to cross the tape. There must be something there. I'm trying to cross the tape here, Your Honor. That's what happens when a judge asks, and what's your next argument? Well, Moran raised it. How about this one, which frankly troubles me about Moran? Moran talks about what was done prior to Moran. Moran was, what, 15 years ago. What do we know about the application of this rule by the Nevada courts since that time? That has been set out in our opening brief at perhaps tedious length, many, many examples. But I think I should just give you one, which is in the brief, but I think it's worth focusing on. Because the Nevada Supreme Court has taken the position since Pellegrini in 2001 that an application of these rules is mandatory. It's not discretionary. It's purely mandatory. You have to apply all of these rules. In Rippo, we had a case that was pending in the Nevada Supreme Court on a habeas appeal, a habeas appeal. So it is nine years after finality. If the individual had raised that claim, either in the habeas petition itself or in the Nevada Supreme Court, it clearly would have been barred. Well, let me tell you what I'm looking for. The Supreme Court has told us in one of this year's unanimous reversals that California's timeliness standard is an adequate and independent state ground. Despite the fact that California makes application of that discretionary. The Supreme Court made pretty clear that the discretionary element is not enough to disqualify. So what I'm looking for is amongst the many citations you've given us, and what I confess I haven't found yet, but I may not have a full handle on them, instances of where the Nevada Supreme Court didn't simply elect to, say, go off on the merits as opposed to apply the timeliness rule, but instances where the Nevada Supreme Court ruled in favor of somebody who would be in the position of your client that we call the petitioner, whatever terminology they use, disregarding a potential timeliness objection. Are there instances like that? There are a few. They exist. And unfortunately, they were not cited in the Moran decision, although they existed at the time. But RIPO is one of those cases where even though relief was not granted on this client, because what we're talking about is reaching the merits of the client, not whether you win or lose. Well, see, but reaching the merits isn't enough, because the Supreme Court has said there are circumstances where the court may choose to reach the merits, and that's okay. That doesn't mean it can't be an adequate or independent state ground. Respectfully, Your Honor, I disagree. This is not discretion. This is not Walker v. Martin because Walker v. Martin talks about a discretionary application of a rule. Here, what we're talking about, I submit, is is this a rule or not? The Nevada Supreme Court says application of these rules is mandatory. But when it wants to ignore them, it does. If you look at RIPO, there is no discussion of discretion. There's no reference to the fact that this claim was raised sui sponte by the Nevada Supreme Court after the case was already in the Nevada Supreme Court on the habeas appeal and was therefore presumptively barred under 34.800 as well as 34.726 and 34.810. I have only a minute left if I may. Thank you. Thank you, Mr. Beschetta. Thank you, Mr. Beschetta. We'll hear from the State. Good morning. Good morning, Your Honor. May I please the court, counsel? My name is Robert Wieland. I'm a senior deputy attorney general employed by the Office of the Attorney General of the State of Nevada, and I have the privilege of representing the respondents in this matter. As this court has already taken note, this litigation has been proceeding for three decades, and this is the archetypical case that calls for finality. As respondents have noted in their answering brief and in their supplemental answering brief, there is no basis upon which either relief can be granted with respect to the merits of any claim that was presented in this action, nor is there any basis upon which this court should return this matter back to the federal district court. Discussing things in reverse order, I'll talk about the adequacy of NRS 34.800 first. Respondents moved to dismiss certain claims in this particular action based on the application by the Nevada Supreme Court of NRS 34.800. The petitioner sought to challenge the adequacy, only the adequacy of that, and in examination of the opposition to respondent's motion to dismiss, you will find 12 cases that the petitioner cited that he thought was evidence, if you will, that the Nevada Supreme Court did not, that NRS 34.800 was not adequate. Those appear at pages 2971 through 2972 in petitioner's opposition. That's the excerpt of the record. But of note in that, the petitioner made reference to Ford v. Wharton, 111 Nevada 872, 886 to 887, a 1995 case, which this court, in the Moran case, had already deemed to be irrelevant to the determination of the adequacy of NRS 34.800 because it didn't discuss NRS 34.800. And if you look at the dozen cases that the petitioner cites, there is exactly one that talks about NRS 34.800, and that one was Riley v. State, appearing at 2826 through 2829 of petitioner's, or excuse me, that's the exhibit he submitted, and in that case, the Nevada Supreme Court did apply NRS 34.800, noting that the State District Court had erroneously failed to recognize that a fundamental miscarriage of justice might be sufficient to overcome the procedural bar. However, in that particular case, Riley, he failed to overcome the procedural bar. Mr. Grishetta made reference to Rippo. However, he did not offer Rippo with respect to NRS 34.800. The point being, Your Honors, is in Bennett v. Mueller, this court said that the petitioner has to come, once a bar is adequate, found to be adequate, the petitioner has to come forward with evidence rebutting that, placing that at issue. And our point is that based on the submission presented by the petitioner, he did not even place the adequacy of NRS 34.800 at issue. With respect to whether or not ground three was exhausted, it's our position that ground three is... Before you leave, I guess I'm not sure I understand what you mean in terms of saying has not placed at issue the adequacy of the state bar. I mean, we've got a boatload of cases being pushed forward at us. Your brief elected not to discuss any of those cases, appeared to elect to stand on a combination of Moran and a belief that our court's Bennett decision was wrong and should be disregarded. So what are we supposed to do with these boatload of cases in front of us? Well, Your Honor, under Bennett, we didn't elect just to stand pat. And our point is if he has placed it at issue, if he has met whatever threshold is established by Bennett, then there should be an evidentiary hearing with respect to whether or not NRS 34.800 is adequate. Our point is he didn't even place it sufficiently at issue. What's he have to do to place it sufficiently at issue? He has to, under Bennett, come forward with cases, evidence, showing that the bar is not... Cited a bunch of cases. I got lots of cases here I don't think. No, citing a bunch of cases is not... You can say here, have a look at the entire Nevada Supreme Court decision since NRS 34.800... And I would have expected a response from you explaining why that wasn't right. And what I got from you was something far short of that. I mean, this answering brief doesn't dispute the cases that he pushed forward, except in a very generic fashion. Well, I think what we say is that he didn't meet his burden. And we're supposed to figure that out for ourselves without any help from you. Why aren't the cases that he cited sufficient to meet his burden? Because as I just pointed out, under Moran, the cases that he cited with respect to the applicability of NRS 34.800 are irrelevant. He can't just sit there... His burden is not just sit there, hey, have a look at some cases. He has to put forward his reasons why that demonstrates that NRS 34.800 is inadequate. And he didn't do it. He just said, here, look at some cases. But why didn't you give us your take on why each of the 12 cases that he cited was irrelevant? Or are you just leaving that up to us to do in our spare time? Well, as I pointed out in the reply to the opposition to the motion to dismiss, that he had presented nothing that would raise it, that would satisfy the Bennett standard to the extent that there is some standard in Bennett. So the answer is we just have to read the cases and then we'll see that you're right. I mean, is that basically what you're telling us? What I'm saying is that his presentation in the first instance, Bennett says he bears the initial burden of showing that it's inadequate. But doesn't he do that by citing to cases in which the statute has not been adequately and consistently applied? You don't know that because he didn't say that. He didn't show that. He had the opportunity, as Judge Reed said, for an evidentiary hearing on any and all issues. And he didn't. He didn't even seek an evidentiary hearing on that. What's the story on ground three? On ground three, it's our position that ground three is unexhausted as with respect to the particular claim. As I said, it's unexhausted. Nevertheless, as this court, actually there is only an issue of law with respect to this. As Your Honor noted, Pinholster, you cannot consider anything other than what was in the record at the time. Whatever evidence that is belatedly presented or attempted to be presented cannot be considered in this particular case. It's important to note that under the AEDPA, you could not grant relief on an unexhausted claim. You could only deny relief. Why do you say it wasn't exhausted? If I understand the story right, he goes to trial, makes a motion to change venue, it's denied, he takes it to the Nevada Supreme Court, and they wind up ruling against him and sending it back. He says, I'm entitled to a change of venue because of all these things, why I can't get a fair trial from this jury in this venue. First, Mr. Weibar argued, well first the claim is a claim of a violation of the 6th Amendment, 8th Amendment, 14th Amendment, the claim that he presented to the federal district court, that the jury convicted and sentenced him did not meet the constitutional standards of impartiality due to the state court's refusal to change the venue of the trial. Now, he argued in his supplemental brief on direct appeal, that the Nevada statute governing the change of venue motions, NRS 2.090, was unconstitutional because it required Weibar to choose between his speedy trial rights and his right to resume. That was in his direct appeal of the conviction? Beg your pardon? That was his direct appeal of the conviction? Yes, Your Honor. What about his appeal of the denial of the motion for change of venue? In the motion for the change of venue, it's not the same claim, Your Honor. If you look, the only thing that he presented to the federal district court appears in Excerpt of Record 162. What did he appeal interlocutorily? The denial of the motion to change venue. What did he complain to the Nevada Supreme Court about? My recollection is it was the same thing that was presented essentially on direct appeal, which is not the same claim. That his change of venue motion should have been granted because you can't get an impartial jury in that venue. Is that right? I wouldn't quite put it that way. Well, I'm asking you, how did he put it? Well, that's a question because he didn't provide the court with his briefs or anything in that to show exactly how he did put it. Well, you've told us here that it's a different claim and I'm asking you how it's different and I'm not hearing you tell us how it's different. My recollection, well, he has- Let me put it another way. It looks to me like he exhausted it when he appealed the denial of the motion for change of venue. It looks like he went to the Nevada Supreme Court and they turned him down and he said, you should have changed venue. They said, no, you shouldn't, and that's the end of the ballgame. He had another claim on his subsequent direct appeal when he was convicted, but I'm having a hard time finding out why that's not, or understanding why that's not exhausted. Even if this court were to conclude that it is exhausted, he's not entitled to relief on it because he hasn't demonstrated that his jury was not fair and impartial. As a matter of fact, when the jury came back following the time between the direct appeal, the state and the defense canvassed the jury. The judge canvassed the jury and asked whether or not they had adhered to their oath, and both the state and the defendant indicated at the conclusion of the additional voir dire by the judge that they were satisfied that the jury had maintained its oath in the interim. He has not demonstrated that the jury was not fair and impartial. I guess I'm not sure how the response to that supplemental voir dire satisfies the concern that's raised. I mean, they hadn't violated their oath in the meantime. The objection to the request for the change of venue was driven by something other than the behavior of the people that would ultimately be chosen for the jury. I'm not saying they're not connected somehow, but I'm not sure. I don't understand how their answers to the supplemental voir dire speak to what we're facing today. You've got a point there. I just don't follow it. Well, I guess the problem I have articulating a response is that... Let me put it this way. What you just said meant nothing to me. If you think you've got something that should be powerfully understood, then you've got to give me another chance because I think there is a germ of an idea in there. But what you said just didn't register with me at all. Okay. Let me see if I can help. Is your argument that under the Supreme Court standard of Clark versus Murphy, in determining whether a jury drawn from a small county that has been exposed to potential prejudicial pretrial publicity, if the jurors during voir dire are able to say that they can put aside whatever they may have read in the newspaper and render a fair and impartial verdict based on the evidence, that meets the Supreme Court standard and therefore it's presumptively an impartial jury? That's correct. All right. And then are you saying that at the end when they came back and brought the jury back in again and they revoir dired them, if that's the word, and they all said, yes, I can still be fair and impartial and I haven't exposed myself to anything in the interim that has changed my answers, that that's what happened? Is that what you're saying? That's it, Your Honor. And there's a question in the first instance, the extent of any exposure that there might have been, which is why I point out the pinholster case. You cannot consider anything other than what was before the court, the state court, at that particular point in time. I know the petitioners tried to throw some other things in there, but the Nevada Supreme Court's decision is entitled to deference under AEDPA. Well, what's your answer to my question to Mr. Pachetta, that can we resolve that question? Let's assume that we disagree with you and we find that the claim was exhausted when the Nevada Supreme Court denied relief. Given the fact that we cannot reconvene the jury, if we could ever find them, to hold some sort of a federal evidentiary hearing in order to give Mr. Ybarra a chance to show that their answers were untruthful and that they really had been exposed to something they shouldn't have heard, why can't we just resolve that issue by looking at the record, which is now frozen in time, and decide it rather than send it back to Judge Reed? If you find that the claim has in fact been exhausted, then this court has to apply the AEDPA standards under 28 U.S.C. section 2254D. Yeah, but can we do it, or does Judge Reed have to do it, triggering another round of appeals? Well, I suppose it would have to be a de novo. Well, this court sits with respect to claims that Judge Reed has ruled on de novo. You're reviewing it from the same manner, from the same position as it was presented to the federal district court, and that would be based on the state court record on that. Which would be a combination of the affirmance by the Nevada Supreme Court that found that there was no violation of the statute and no constitutional deprivation, and a factual finding by the trial judge after the second round of law here that the jury was still fair and impartial. And any other factual findings that would be germane to the issue? Based on the historical record that we already have. I do not see any, I cannot envision any particular impediment. Well, Mr. Pachetta has not had an opportunity to brief that claim, has he? I guess he has. That is claim three, and we did grant a COA on that claim. You granted a certificate of appealability with respect to whether or not he's exhausted. Exhausted. So he still hasn't had a chance to brief the merits. So if we are to do it, shouldn't we give him an opportunity at least to file supplemental briefs so that he can make the best argument that he can as to why it doesn't meet the AEDPA standard if we're going to decide it? Well, then I would suggest, Your Honor, that we have the opportunity to because Well, I'm not suggesting that we're only going to do this one way. I'm just trying to work out what the correct procedure is to avoid what I think is just a complete inordinate delay that is not otherwise justified if we have to send it back down to the district court to do what we have to do anyway. If this court were inclined to offer, find that and order supplemental briefing, we would certainly oblige the court. The only point that I would make is we would like to, if the court were to find that it was exhausted, we want the opportunity to say why AEDPA deference should be applied. That's what I assume you would say in your supplemental brief. The question is do you say it to us or do you say it to Judge Reed in the first instance? Judge Reed. I'm trying to think of other considerations why it should be Judge Reed as opposed to this court. Our argument, we would not waive our argument that it is unexhausted, and therefore our position would be that there would have to be clearly applicable procedural bars applied under Coleman v. Thompson. But that's the same argument, presumably, that you would make before Judge Reed if we sent it back to him, wouldn't it? That's correct, Your Honor. I mean, it's really a legal question. Mr. Poschetta doesn't get an evidentiary hearing under pinholster. That's true. So if we sent it back, the district judge would call for briefing from both the parties, then he would render a decision on the merits under applying AEDPA, and then Mr. Poschetta would take another appeal back to us, and then we would look at it de novo and make the same determination all over again. As long as we're free to assert all of our defenses, Your Honor. I'm not asking you to waive anything of this White House. I'm just trying to figure out the process here that we should follow. I'm trying to, too, Your Honor. I think I hear you saying it. Tell me if I'm not reading your body language right. But I think I'm hearing you saying if we find it's exhausted, Judge Reed was wrong about the exhaustion. If we find that it was exhausted, you don't feel strongly one way or the other where you fight out the merits as long as you get your chance to put your licks in, is that right? Well, that's correct, too, but I'm also considering, trying to consider if there's any particular tactical advantage to having Judge Reed. I mean, we're not in the tactics business. We're trying to figure out the proper way to deal with this. Normally, we get it from the district court. We get the benefit of the district judge's analysis and thought process and so forth. I understand that while you might not be considered tactically, since I represent respondents, I am. What else do you want to talk about? You've got about eight minutes left. With respect to the other points and the epidemics that this court has to afford, the decisions of the Nevada Supreme Court, and with respect to any errors that this court may find, Mr. Wybara is not entitled to federal habeas relief because no error in this particular case was going to overcome the fact that Mr. Wybara kidnapped this girl. He sexually assaulted her. There's the evidence regarding her purse that was found some distance from the burn site, the victim's prints on the beer can from the defendant's trailer, the areas noted in the record where the victim struggled, the areas, I think the record reflects five to ten areas where after the victim was burned, she was, the tire tracks, the victim's prints on the broken mirror, the mirror that was consistent with the mirror that was found in the defendant's trailer, the defendant's print on the gas can. Is there really a whole lot of doubt at this point about the guilt of the defendant? I'm not talking about the guilt, Your Honor, right now. There is no issue with respect to the guilt. What I am trying to address now is whether or not any error, if this court should find that there was any error, had a substantial and injurious effect on the verdict. I'm having a little difficulty understanding how the rundown of evidence speaks to that. Well, because if Mr. Wybara, with respect to his claims of ineffective assistance of counsel during the penalty hearing, he asked to show, first of all, that counsel's performance fell below an objective standard of reasonableness. Secondly, he asked to show, effectively, that he would not have otherwise been sentenced to death. And this court has to give deference to the Nevada Supreme Court's findings with respect to the harmlessness of those errors. And the Supreme Court has told us that in cases where the evidence of guilt is overwhelming, it's harder under Brecht to grant relief because it is less likely that any errors would rise to the level of substantial and injurious to the point that it actually affected the verdict. That is correct. But in any event, the evidence is, in fact, overwhelming. As this court noted, there was the concession that the victim was mutilated. And as an additional aggravator, Mr. Wybara had been previously convicted of a prior violent felony. Unless the court has any other questions. Thank you, Mr. Whelan. Thank you, Your Honor. Mr. Buschetta, I think you had a minute. Why don't we make that three minutes for Mr. Buschetta? Thank you, Your Honor. I will try to talk fast, though it's hard for me. Responding to Judge Clifton's point, the reason Rippo and these other decisions, whether published or unpublished, are relevant and change the evidentiary picture. And I think that Lambert does require the court focus in the application of the adequacy of a default rule as of the time it's imposed. As of the time, rather, that the default allegedly occurred. Counsel says it's irrelevant. Rippo is irrelevant. All these cases are irrelevant because they don't mention 34.800. That's exactly the point. These are supposedly mandatory rules. The Nevada Supreme Court has not said we have discretion, we're going to exercise it this way or that way. No. They say these are mandatory rules, we have to enforce them, but when they don't want to, they don't. That's what happened in Rippo, which is a very recent case, 2006, long after Moran. The Nevada Supreme Court had exactly the same power to do that in Mr. Ebarra's case as it did in Rippo. And I submit that's the end of the case in terms of whether this is really a rule or whether it's a rule that the Nevada Supreme Court uses when it wants to, but without any exercise of a standard, a discretion that has standards attached to it. They ignore it when they don't. The Supreme Court has told us, we've got lots of cases involving California's unusual habeas system and lots of cases about the timing between them and so forth, and it was Carey v. Safford, the Supreme Court, made the point that just because the California Supreme Court happens to dispose of an issue on the merits, that doesn't mean there wasn't a timeliness problem. There are circumstances in which the court may decide to discuss the merits, and Justice Breyer, I think it was, gave various examples. Do we have any cases from Nevada that don't fall into that pattern? That's why I'm really looking for something that shows where the court not only elected not to impose a timeliness rule, but disregarded it in a way that would have affected the outcome, so acted as if the timeliness rule wasn't there. Well, in terms of affected the outcome, I view addressing the merits as affecting the outcome. I'm not so sure that's the case, so that's why I'm asking for something more than that. What we have are Hardison and Stevens, which are unpublished cases that have been around since before Moran, but weren't addressed in Moran. And I believe that the problem under Lampert is you have to address those unpublished decisions, even though Moran didn't, and that's the change in the pattern. I see you're out of time, Mr. Bishop. Could I just say one thing in answer to Judge Solomon's question? Sure, and then wrap that up if you want. What we keep coming back to in this case, and maybe it's my own callousness as someone who litigates death penalty cases, the fact that Nevada juries never have to impose death means something. They do not impose death sometimes. In Sechrest v. Ignacio, this court found a murder involving two little girls taken out into the desert and killed with a shovel. It found error and prejudicial error in that case, despite the same argument that that was a sort of natural born death case. If you look at page 49 of our opening brief, all it is is a news story, but it's something an actual jury in Nevada did. There was a robbery. The robber, who's mentally ill, doused the victim with gasoline in order to get the money, set him on fire, and killed him. That individual did not get death. So the lay assumption, and I don't mean as members of the court, but as members of the public who do not see these cases all the time, that sounds like a natural born death case, but it wasn't. You have to treat this case the same. I thank the court for its attempt. Thank you, gentlemen. The case just argued is submitted. We'll stand in recess for 10 minutes. All rise. We'll stand in recess for 10 minutes.
judges: Silverman, Tallman, Clifton